Shauna L. CONROY, Plaintiff-Respondent,†

v.

MARQUETTE UNIVERSITY and St. Paul Fire & Marine
Insurance Company, Defendants-Appellants.

Court of Appeals

*No. 96–2324. Oral argument February 5, 1998.—Decided May
12, 1998.*

(Also reported in 582 N.W.2d 126.)

† Petition to review denied.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Samuel J. Leib, Christine A. Koehler,* and *Douglas S. Knott* of *Leib and Associates, S.C.,* of Milwaukee, with oral argument by *Samuel J. Leib.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *E. Campion Kersten* and *Leslie Van Buskirk,* of *Kersten & McKinnon, S.C.,* of Milwaukee, with oral argument by *E. Campion Kersten.*

Before Fine, Schudson and Curley, JJ.

CURLEY, J. Marquette University and its insurer, St. Paul Fire and Marine Insurance Company,

appeal from the judgment entered against them following a jury verdict in favor of Shauna Conroy. The jury found Marquette negligent for allowing Conroy, a student employee, to conduct the dormitory room checkout of a recently expelled student who later attacked Conroy off campus, causing serious injuries. The jury awarded Conroy $125,000 in damages. Marquette argues that the trial court erred by: (1) denying Marquette's motion for dismissal based on public policy considerations; (2) changing the verdict question and reinstructing the jury after the jury had begun their deliberations; (3) submitting a verdict question concerning contributory negligence; (4) directing a verdict on the question of whether the worker's compensation law was the sole remedy available to the plaintiff; and (5) finding that there was sufficient evidence to sustain a finding of causation. Because we conclude that, under these unique facts, public policy considerations prevent Conroy from recovering from Marquette, we reverse with instructions that this matter be dismissed with prejudice. Due to our ruling, it is unnecessary to address any other issues raised in this appeal.

## I. BACKGROUND.

In the summer of 1991, Conroy was both a student and an employee of Marquette University. While a student living in a dormitory, she was hired by the university as a Resident Assistant, and one of her tasks was to supervise the dormitory room check-out procedure whenever a student left the dormitory.

On July 16, 1991, Alicia McDonald, a summer participant in a nationwide program for pre-college disadvantaged students, was expelled from Marquette for inappropriate behavior. The incidents which led to her dismissal consisted of McDonald insulting her

English professor, arguing with fellow students in a classroom, and talking and acting inappropriately and bizarrely in a study hall.

After she was expelled, McDonald went to the room of Althea McLeod, a student counselor, with whom she had argued previously. An angry McDonald told McLeod that she blamed her for her expulsion. McLeod called Myra George, the assistant director of the summer program which McDonald had attended, who came to see McLeod and suggested that McLeod leave the dormitory and not return until McDonald was gone.

Conroy was given the assignment of supervising McDonald when she checked out of her dorm room. She was not told, however, why McDonald was leaving her dormitory room, nor informed of any of the incidents leading up to McDonald's expulsion, but she was instructed to contact a hall director if she had any problems. At approximately 7:00 p.m., anticipating that McDonald was ready to be checked out, Conroy went to McDonald's room. After Conroy found that McDonald had made little progress in packing, Conroy and McDonald began arguing. Conroy then left the room, contacted her supervisor, and related that McDonald was not cooperating.

Shortly after Conroy left McDonald's room, she encountered a woman, whom she later learned was George. George had returned to the dormitory and asked Conroy to summon McDonald to the lobby. McDonald complied, accompanying Conroy back to the lobby where she and George had a heated conversation in Conroy's presence. The conversation concluded when McDonald agreed to be ready to check out and leave in an hour's time. On the strength of this agreement, Conroy returned to McDonald's room

approximately one hour later, and discovered that McDonald had not completed her packing. They again argued, and although McDonald made no verbal threats, she swore at Conroy, refused to allow her to use the phone in her room by pulling the telephone cord from the wall, and displayed a steak knife. Conroy left and reported the problems to the supervising hall director who, in turn, called the campus police. On her way down to the lobby, Conroy had to pass by McDonald's room. McDonald glanced up and, upon seeing Conroy, showed her the knife and rhetorically commented something to the effect, "Do you want to get hurt?" However, by the time the campus police arrived, McDonald had already left and Conroy did not see her again that evening.

The next evening, Conroy, accompanied by several friends, went to a downtown nightclub where she saw McDonald. Conroy testified that she became uncomfortable because McDonald was obviously talking about her and pointing Conroy out to McDonald's friends. However, Conroy said nothing to the people in charge, nor did she leave upon discovering McDonald in the club. At around midnight, as Conroy was leaving, she noticed that McDonald was also leaving. As Conroy was walking to a bus stop with several friends, McDonald began taunting and calling out to her. Eventually, McDonald caught up to Conroy and struck her in the face with a broken bottle, causing serious injuries.

Conroy commenced suit against McDonald, Marquette and St. Paul Fire and Marine Insurance Company, Marquette's insurer. McDonald was dismissed from the suit for failure to obtain personal service, as she could not be found. Originally, Marquette prevailed in a motion to dismiss on the grounds

that Conroy's claim was incidental to her employment and barred by the Worker's Compensation statutes. That decision was appealed, with this court reversing the trial court's finding, and determining that questions of material fact existed as to "whether, at the time she was injured, [Conroy] was performing services growing out of and incidental to her employment by Marquette." After the denial of a variety of pretrial motions, including motions to dismiss on public policy grounds, the matter proceeded to a jury trial. During the trial, Marquette twice moved for a directed verdict, arguing that there was no causal link between Marquette's alleged negligence and McDonald's attack on Conroy. Both motions were taken under advisement. The trial court did find, however, ruling on its own motion, that, at the time of the attack, Conroy was not performing services incidental to her employment. After the jury began deliberations, the jurors sent several questions to the trial court which prompted the trial court, over the appellant's objection, to revise the Special Verdict Form and to reinstruct the jury. The jury eventually returned a verdict finding Marquette 80% causally negligent, and Conroy 20% causally negligent, and awarded Conroy damages of $125,000. Marquette brought motions after verdict asking for a change in the jury's answers to the verdict questions, a new trial, or dismissal on public policy grounds. These motions were denied and this appeal follows.

## II. ANALYSIS.

Marquette argues that, even if we accept the jury's finding that Marquette was negligent because it violated a duty of ordinary care towards Conroy, liability should not be imposed because of public policy considerations. We accept the jury's finding of negligence and

determine that, under the facts of this case, Marquette should be granted the relief it seeks.

Whether public policy considerations preclude the imposition of liability is a question of law which we review *de novo. Schlomer v. Perina,* 169 Wis. 2d 247, 252, 485 N.W.2d 399, 401–02 (1992). Public policy considerations may preclude liability if: (1) the injury is too remote from the negligence; (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; (3) in retrospect, it appears too highly extraordinary that the negligence should have brought about the harm; (4) allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; (5) allowance of recovery would open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point. *Coffey v. City of Milwaukee,* 74 Wis. 2d 526, 541, 247 N.W.2d 132, 140 (1976).

Marquette believes that all six of the *Coffey* factors are present in this case and that liability is therefore precluded. We conclude that, given the unique facts present in this case, three specific *Coffey* factors preclude liability, namely: (1) the injury is too remote from the negligence; (2) allowance of recovery would enter a field that has no sensible or just stopping point; and (3) in retrospect, it appears too highly extraordinary that the negligence should have brought about the harm.

*A. The injury is too remote from the negligence.*

The word "remote," as it is used in this context, means "removed or separated from the negligence in time, place, or sequence of events." *Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.,* 176 Wis. 2d 740, 762, 501 N.W.2d 788, 796 (1993). Marquette argues that the

injuries in this case are too remote from the negligence because Conroy's injuries occurred thirty hours after Marquette's alleged negligence, off-campus, at a downtown club patronized by the victim and the perpetrator. Marquette submits that in addition to the injury being removed temporally and spatially from the incident of negligence, the injuries in this case are remote in terms of the sequence of events, because Marquette controlled none of the operative circumstances at the time of the injury and could have done nothing to prevent the attack. In support of its argument, Marquette states that it did not require Conroy, nor could it prevent her, from patronizing an off-campus downtown club. Marquette notes, and Conroy concedes, that Conroy's patronization of the club was not connected to any Resident Assistant job duties.

We agree with Marquette that Conroy's injuries were too remote from the negligence to allow imposition of liability. In *Rockweit v. Senecal*, 197 Wis. 2d 409, 541 N.W.2d 742 (1995), the defendant was a social guest at an adjacent campsite who was found to be negligent for failing to extinguish hot embers contained in a campsite fire pit. Later, a small child fell into the fire pit, resulting in serious injuries. Although the Wisconsin Supreme Court agreed that the defendant was negligent, the supreme court held that liability was precluded because the child's injuries, which occurred several hours after the defendant's negligence, at a time and location beyond her control, were too remote. *See id.* at 428, 541 N.W.2d at 751. The supreme court stated, "[W]e conclude as a matter of law that the injury that [the child] suffered several hours later outside [the defendant's] presence is too remote from any alleged negligence on her part to impose liability." *Id.* In this case, Conroy's injuries occurred at a

much later time, approximately thirty hours after Marquette's negligence, and Conroy was injured at a location far removed from the place of Marquette's negligence, at a time and place beyond Marquette's control. Therefore, we conclude that Conroy's injuries were too remote from Marquette's negligence to allow imposition of liability.

*B. Imposition of liability would enter a field that has no sensible or just stopping point.*

Marquette also claims that imposition of liability would enter a field that has no sensible or just stopping point. We agree. In *Rockweit*, the supreme court stated, "[W]e see no sensible stopping point if liability were to be imposed on someone in [the defendant's] position, as she merely visited the campsite, played cards and socialized as a guest of the [child's parents]." *Id.* at 429, 541 N.W.2d at 751. An analysis of Marquette's negligence yields a similar conclusion. To impose liability on Marquette for the vicious actions of a discharged student which resulted from a one-time encounter of this nature with a student employee, and which occurred over a day after Marquette's negligence and after a chance encounter at an off-campus location, leads to no sensible or just stopping point. This becomes apparent when one considers the hypothetical situations raised by Marquette's counsel at oral argument and in Marquette's briefs. Would Marquette be held responsible if Conroy and McDonald had met in Chicago that weekend, rather than at an off-campus Milwaukee nightclub? Would Marquette still be responsible if the attack occurred in New York a year later? To permit the imposition of liability on Marquette for the injuries caused by McDonald's acts at a downtown club, neither controlled by Marquette nor requiring attendance by

Conroy, well after any negligent act committed by Marquette occurred, is to enter a field with no sensible or just stopping point because there are no obvious or clear guideposts for the cessation of liability. As we recently noted, "[A]s the list of public policy factors reflect, . . . we trace the consequences of one's negligent act, not indefinitely, but to a certain point." *Becker v. Olson*, No. 97–0641, slip op. at 9 (Wis. Ct. App. March 25, 1998, ordered published April 29, 1998). Marquette should not be held responsible for its negligence under these unique circumstances. Therefore, we conclude that liability is precluded because imposition of liability would enter a field that has no sensible or just stopping point.

*C. In retrospect, it appears too highly extraordinary that the negligence should have brought about the harm.*

Finally, Marquette argues that liability is precluded because, in retrospect, it appears too highly extraordinary that its negligence should have brought about the harm suffered by Conroy. We agree. Even assuming Marquette's negligence, this type of negligent conduct would not ordinarily result in such drastic consequences. That Conroy, who was involved in the ministerial task of checking McDonald out of her room, would be at risk for the serious injuries McDonald inflicted upon her, was not the sort of behavior that was rational or predictable. Marquette's negligence, at most, amounted to directing a student-employee to check an expelled student out of a dormitory, without informing the student-employee that the student leaving the dormitory had been expelled because of belligerent, although not physically assaultive or threatening, behavior, and permitting the student-

employee to continue the check-out after the student became uncooperative. No one could have reasonably expected that an ill-tempered student, who had acted inappropriately but had not exhibited violent tendencies, would brutally assault another student with a broken bottle off-campus thirty hours later, in revenge for her expulsion. Further, nothing that McDonald said or did put Marquette on notice that she would likely physically attack Conroy and slash her face with a broken bottle the next night at an off-campus nightclub. McDonald never indicated that she would seek revenge for Conroy's limited role in McDonald's departure from Marquette. Other than the situational anger displayed towards Conroy because McDonald was upset at having been expelled from school and the dormitory, McDonald gave neither Marquette nor Conroy reason to believe that McDonald posed a future threat of physical harm to Conroy.[1] Thus, we conclude that liability is also precluded because, in retrospect, it appears too highly extraordinary that Marquette's negligence should have caused such great harm to Conroy.

### III. CONCLUSION.

██

In sum, we conclude that, even assuming that Marquette was negligent in assigning Conroy the task of checking McDonald out of the dormitory and the handling of that check-out, the imposition of liability against Marquette is precluded by public policy consid-

---

[1] In fact, Conroy admitted that she was surprised by McDonald's response. Conroy stated at McDonald's criminal trial: "I didn't want to talk to her because I couldn't frankly understand why she was so angry with me. I had nothing to do with her leaving Marquette University or the halls for that matter."

erations because: (1) Conroy's injury was too remote from Marquette's negligence; (2) allowance of recovery from Marquette would enter a field that has no sensible or just stopping point; and (3) in retrospect, it appears too highly extraordinary that Marquette's negligence would have brought about the harm. Therefore, we reverse the judgment and remand to the trial court with directions to dismiss with prejudice Conroy's suit against Marquette.

*By the Court.*—Judgment reversed and cause remanded with directions.